OPINION
Per Curiam :*
Plaintiff seeks recovery for the period sbe was involuntarily placed on sick leave, annual leave, and leave without pay, under the following circumstances:[1]
She was employed by the Bureau of Internal Revenue in San Francisco, California, as a tax examiner to audit income tax returns. Occasionally she interviewed taxpayers to obtain additional information.
By 1960 and for some túne prior thereto the plaintiff, then single and 45 years of age and overweight, was unkempt and careless in her attire and general appearance. She was obsessed with the view that women were being discriminated against and that the tax structure was unfair to single taxpayers such as herself. She was constantly voicing her complaints on these subjects to her fellow employees and interfering with their work as well as her own. She freely voiced her opinions on the subjects of her obsessions to taxpayers with whom she came in contact and manifested to them her biases. Several taxpayers complained to plaintiff’s superiors about her conduct during interviews. During 1960 plaintiff’s work was below par both in quantity and quality. She had the lowest rate of production of any of the 85 employees in her office and the highest rate of “charge backs”, i.e., rejections, on the cases she handled.
On October 7, 1960, the District Director instructed the plaintiff to report for a complete medical examination to determine whether plaintiff had an emotional condition and the extent to which it affected her work. On October 12, 1960, plaintiff was examined by Dr. Harding of the Public Health Service who, on the basis of a one-hour interview, *347 diagnosed her condition as “paranoid state” and recommended that she he given disability retirement.
By letter of October 18, 1960, plaintiff was advised that she was being placed on sick leave due to her abnormal behavior on the job and that her mental condition had rendered her incapable of further useful service with the Revenue Service.
Plaintiff refused to apply for disability retirement and so the IRS applied for her.[2] In opposition to the agency’s application, plaintiff submitted statements from her personal physician and from a psychiatrist stating that plaintiff was mentally and emotionally stable on October 18, 1960, and at all times thereafter. Ultimately, after further examinations by psychiatrists designated by the Civil Service Commission, plaintiff was denied disability retirement. The Civil Service Commission stated: “* * * the employee is not totally disabled within the meaning of the retirement law.”
During the period that the Civil Service Commission was considering the application of the IRS for plaintiff’s disability retirement, plaintiff was carried successively and involuntarily on sick leave, annual leave, and leave without pay. The Government carefully met all of the procedural requirements in thus placing her on involuntary leave.
Since the agency was unsuccessful in its attempt to involuntarily retire plaintiff, she was allowed to return to work on February 19,1962, whereupon she was immediately served with a letter of charges proposing her removal for inefficiency and emotional instability. Plaintiff was removed on May 11, 1962, and[1] this removal was ultimately sustained.[3]
The principal issue here is whether plaintiff can recover for the time spent on involuntary leave while the Government was unsuccessfully attempting to retire her for mental disability.
The plaintiff has made out her case for basic recovery. The Government used up her sick and annual leave and then *348 placed her on leave without pay under the mistaken assumption that she was mentally ill. The Government made the mistake and must bear its lawful consequences.
Although IES proceeded in connection with the Civil Service Eetirement Act instead of the Lloyd-LaFollette Act, the plaintiff can recover by virtue of the theory set forth in Kleinfelter v. United States, 162 Ct. Cl. 88, 318 F.2d 929 (1963). The Lloyd-LaFollette Act was amended in 1948 to provide that an employee who is removed from his position and then is restored to it on the ground that his removal was “unjustified or unwarranted” has the right to recover the “compensation” of which he had been unjustly deprived.[4] The Eetirement Act was not so amended, but Kleinfelter v. United States, supra, held that the two Acts are in pari materia and should be read together. Thus the plaintiff has access to the remedy provided by the 1948 amendment to the Lloyd-LaFollette Act, even though proceedings had been brought against her under the Eetirement Act. Since the placing of plaintiff on involuntary leave because she was mentally disabled was erroneous and, recognizing this, the Government restored her to her position, the prerequisites to recovery have been met.
The Government opposes plaintiff’s recovery on several counts. Its first argument is that, since plaintiff was ultimately discharged due to her inefficiency for the identical period during which she was suspected to 'be suffering from mental illness, if the discharge proceedings had been brought initially, i.e., prior to the involuntary retirement proceedings, it would never have become necessary to place plaintiff on *349 involuntary leave. The flaw in this argument is that, even if the agency could have discharged the plaintiff for inefficiency in the first instance, it did not do so. Since plaintiff was only attacked on the basis of an involuntary retirement for mental disability, that is all she could defend on. It would have been inappropriate for her to attempt to prove her efficiency at thalt time since the Government had not yet raised the question.
The next contention advanced by the Government is that involuntary retirement proceedings are brought in order to benefit Government employees 'by gaining annuity payments for them. Where mental illness is the specific disability, the employee understandably might well not begin the proceedings himself. As a matter of policy the Government often brings the action against the employee. This can be a praiseworthy gesture by the Government on behalf of its employees, but the Government’s logic that it brings the action to benefit the employee and, therefore, should not have to bear the cost of its mistakes does not bear scrutiny. If the Government’s policy is to help its employees, the policy would not be served by imposing upon a particular employee the loss entailed through a proceeding brought in error by the Government.
To supplement its thesis, the defendant cites Anderson v. Morgan, 268 F.2d 903 (C.A.D.C.), cert. denied, 361 U.S. 846 (1959), for the proposition that, where an employee’s mental condition has interfered with his work to the point of justifying his removal, a disability retirement proceeding must be brought before the agency may attempt to remove bim on charges. But that case simply held, at most, that the agency must apply for the employee’s disability retirement if he falls to do so himself. The Government brought it first in the present instance because it seemed better than having two proceedings (retirement and discharge) running concurrently.[5] Because the Government was mistaken about the disability, the procedure taken turned out to be administra *350 tively inconvenient. Nevertheless, the cost of such inconvenience should not be shouldered onto the employee. As pointed out below, there is another method, not followed here, by which both the interests of the employee and the agency can be preserved.
The Government next contends that the agency was not arbitrary in placing plaintiff on involuntary leave because it was acting in reliance on the initial psychiatric report which classified plaintiff as a paranoid, so the court presumably would have nothing to review. This point would have had validity if plaintiff had attempted to force the agency by court action to put her back to work. But that is not the question here. Until the agency lost its case on appeal it had the right to keep plaintiff away from work. But once it lost its appeal it had to restore plaintiff to her position and reimburse her for the time during which it was acting reasonably, though mistakenly, to the plaintiff’s detriment.
The next inquiry is whether the Annual and Sick Leave Act of 1951, implemented by Part 30 of the Civil Service Regulations,[6] which makes the head of an agency responsible for the administration of annual and sick leave, may be used to prohibit recovery. The Government asserts that as long as the action is not adverse, the placing of an employee on sick or annual leave is solely a matter of administrative discretion. True, except in cases such as this where the agency exercised its discretion under a mistaken assumption adversely affecting an individual employee. The Government should bear the risk of the lost sick and annual leave since it made the mistake, not the employee. The Kleinfelter case so decides.
In upholding IRS’ course of action in this case, the defendant poses a dilemma which it says will be forced upon employing agencies if recovery is allowed here. We are told that, if agencies are “penalized” by having to give back-pay for periods of involuntary leave when the employee is ultimately found not to have been sick or disabled but merely inefficient or obstreperous, management, when faced with *351 intolerable or detrimental actions by employees reasonably believed to be the product of mental or emotional disability, will simultaneously bring removal and disability proceedings. That method of proceeding on two fronts, it is said, will burden the employee by compelling him to defend concurrently against two separate personnel actions “at a time when his emotional well-being is, at best, questionable.” In many cases, the inference is, the agency will press the removal action to completion before the disability proceeding is decided. The Government concludes that it is far better to countenance the agency’s reasonable course of placing the employee on involuntary leave because he is sick or disabled, and then if that reasonable judgment turns out to be mistaken to refuse back-pay where, as here, the employee is thereafter separated on disciplinary or efficiency grounds for the same conduct.
We think that in this argument the Government unnecessarily limits itself to too stark a choice, and fails to see that a third course is open to the employer — a course which will not hurt the employee but will still allow the agency to “protect its interests.” When the conduct of an employee (like this plaintiff’s) impels an immediate suspension from work, and the agency is unsure whether or not that conduct stems from an illness sufficient to call for disability retirement, it can (a) initiate disability proceedings if the employee does not; and (b) at the same time suspend the employee from active duty and place him on involuntary leave with the statement that management is not certain as to the cause of the conduct which makes such “suspension” [7] necessary (i.e. disability, on the one hand, or inefficiency or voluntary misconduct, on the other) but that in either event the good of the service does not permit the employee to continue working in the interim. The statement can go on to say that if the employee is finally found to be disabled he will be entitled to disability retirement, but that, if he is found not to be disabled, formal removal proceedings, based on the deleterious conduct, will then be instituted which if sustained will also result, auto *352 matically, in leaving him without a claim for back-pay for the period of involuntary leave. In this way the agency can make it clear that its “suspension” of the employee is not tied to a determination that he is sick or disabled but results from his conduct in and of itself, whatever the cause of that conduct may be or may ultimately be found to be.
The difficulty in the present case is that IRS did not take that course. When it placed and continued Miss Seebach on involuntary leave, it did so because she was sick and disabled, citing Dr. Harding’s diagnosis. See findings 21, 42, 43, and 45. This basis of the action is made even clearer by the Civil Service Commission’s proceedings on plaintiff’s appeal to it with respect to her placement on involuntary leave. See findings 41,46, and 47. IRS plainly tied its “suspension” of Miss Seebach directly and solely to the application for disability retirement and to the presumed fact that she was ill and disabled. In these circumstances, it should not be surprising that, once she is authoritatively found not to be sick or disabled, she becomes entitled to recover back-pay for periods of enforced leave — just as was Kleinfelter and just as would be an employee who is suspended for misconduct and then is authoritatively found not to have been guilty of that charge. If the only stated basis of the “suspension” falls away, it follows that the employee is entitled to his pay for that period (if the other prerequisites for recovery are fulfilled).
The final question is the amount of plaintiff’s recovery. Plaintiff must show that she was ready, willing and able to work during the period that she was on involuntary leave. The purpose of that prerequisite is to insure that federal employees who are improperly dismissed will recover no more than the amount actually lost as a result of the separation. United States v. Wickersham, 201 U.S. 390, 399-400 (1906). No one questions that plaintiff was ready and willing to work, but only whether she was “able” to work. A finding by the Civil Service Commission in a proceeding for retirement benefits that plaintiff was not disabled cannot be reviewed by this court in a suit for backpay unless it is plainly wrong. Everett v. United States, 169 Ct. Cl. 11, 17-18, 340 F.2d 352, 355-56 (1965). The finding of the Civil Service Commission that plaintiff was not disabled is amply *353 supported by tbe testimony of several psychiatrists that she was not mentally ill. The Government hypothesizes that, even if she was not ill at the time of the later examinations, she must have been so between the time Dr. Harding, after an hour’s examination declared her to be paranoid, and the time of the subsequent examinations. This may or may not be a valid presumption; it is directly refuted by evidence in the record, i.e., a letter dated March 24, 1961, by plaintiff’s psychiatrist who stated: “In summary, it is my considered opinion that there has been no change in Miss Seebach’s mental or emotional condition in recent years * * In any event, the Civil Service Commission’s formal determinations made no such distinction, nor did the Navy doctor who examined plaintiff at the instance of the Board of Appeals and Review (see finding 36) whose determination was the final Commission action. We must take it that the Commission did not find that plaintiff was disabled or sick when she was placed on enforced leave.[8]
The Government also contends that the later discharge for inefficiency, based upon the same acts upon which the retirement proceeding was based, demonstrates that she would have been inefficient during the period in controversy and thus not “able”. But the definition of “able” in the context in issue here simply means “capable”. As long as she has proved her capability to do the work she has met her burden of proof.
Since recovery is being allowed under an amendment of the Lloyd-LaFollette Act read m pari materia with the Retirement Act, the limitations on recovery in the amendment should also apply. Such limitations restrict recovery to compensation lost, less any amounts earned by her through other employment during such period. No annual and sick leave which would have accrued during the time she should have been working is allowed.
*354 The defendant is correct that plaintiff cannot recover additional compensation for the period when she was on enforced sick leave. There is no basis for converting accumulated days of sick leave into a monetary equivalent presently payable. Burich v. United States, 177 Ct. Cl. 139, 366 F.2d 984 (1966), oert. denied, 389 U.S. 885 (1967). The regulations[9] also require reemployment in the Federal Government within three years from date of separation, May 11, 1962, in order for the accrued sick leave to be recredited to her.
Thus, plaintiff should recover her salary for the time that she was on leave without pay and recover the annual leave she was involuntarily forced to use. From this must be subtracted any amounts earned by her in other employment during such period. Judgment to that effect will be entered with the amount of recovery to be determined under Hule 47(c).
FINDINGS on Fact
The court having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and arguments of counsel, makes findings of fact as follows:
1. The plaintiff, who is not a veterans preference eligible, was first employed by the United States in the Bureau of Internal Revenue at San Francisco, California, as a CAF-2.
2. In July 1953 plaintiff, who had been working in the Oakland, California, branch office of the IRS as a GS-9 Revenue Agent, was transferred to the headquarters office in San Francisco to work in the Office Audit Branch. In response to plaintiff’s request of August 1957 for a transfer back to the Oakland office as a field agent and a promotion to GS-11, the District Director declined her request, informed her that her work had been “barely satisfactory” in the Office Audit Branch, and instructed her to desist in her public criticism of the methods, practices and procedures of the IRS.
3. In 1959 plaintiff’s position title in the Office Audit Branch was changed from Internal Revenue Agent to Tax Examiner.
*355 4. Tax examiners audit income tax returns. During the course of the audits it is often necessary for the examiners to interview the taxpayers to obtain information. They must be courteous, considerate and tactful with the taxpayers, to promote the public image of IES, and must demonstrate impartiality, fairness, competency and efficiency.
5. A tax examiner’s reports on individual cases were reviewed by a reviewing staff in the Office Audit Branch. Errors or omissions in particular reports were made the subject of a “charge back” memorandum by the reviewing staff, and were brought to the attention of the originating tax examiner by his group supervisor.
6. By 1960 and for some time prior thereto' the plaintiff, then single and 45 years of age and overweight, was unkempt and careless in her attire and general appearance. She was obsessed with the feeling that women were being discriminated against, that the tax structure was unfair to single taxpayers such as herself, and that the supervisory personnel at IRS were selected on the basis of favoritism. She was constantly voicing her complaints on those subjects to her fellow employees and interfering with their work as well as her own. She voiced her opinions on the subjects of her obsessions to taxpayers with whom she came in contact, and manifested to them her biases, which may have influenced her determinations in the taxpayer accounts assigned to her for review. Several taxpayers complained to plaintiff’s superiors about her conduct during interviews. She was quite vocal in her criticisms of the management of IRS at staff meetings and in public, thus having a disturbing effect on morale. Because of these detrimental habits and idiosyncrasies it was difficult to find employees who were willing to share an office with her.
7. During 1960 plaintiff’s work was below par both in quantity and quality. Although she was a GrS-9 employee, Mr. Celotti, her group supervisor, assigned her relatively simple cases which would normally be assigned to the grade 4 and grade 5 employees in the group. For the year 1960 she had the lowest rate of production of any of the 85 employees in the entire Office Audit Branch, and had the highest rate of “charge backs”, i.e., rejections, on the cases she *356 handled. Moreover, she would not accept constructive criticism from her supervisor concerning the deficiencies in her work and would often react violently when such criticism was made.
8. As of March 1960 the Audit Division felt that plaintiff did not present a good image for IRS and her contact with the public was intentionally restricted by not assigning her to the interview group when she was normally scheduled for rotation to that group and using her for interview work only when there was an overflow which the interview group could not handle.
9. In a memorandum dated September 27, 1960, to the chief of the Office Audit Section, plaintiff’s group chief since March 1960, Mr. Celotti, stated:
It has been observed that Miss Mary E. Seebach has demonstrated by her actions certain characteristics which have hindered her ability to perform her duties in a satisfactory manner.
He then proceeded to discuss certain specific aspects of her improper conduct insofar as it pertained to her supervisors, the taxpayers, and. her fellow employees. He concluded his letter by stating:
The ability of this auditor to perform her work in a competent manner leaves much to be desired. The volume of her work and quality are substandard. Her ability to perform satisfactorily is being hampered by her strong personal prejudices. It is my considered opinion that tins employee’s performance be reviewed.
10. In a memorandum to the chief of the Office Audit Section which was also dated September 27, 1960, Mr. Niland, another group chief, stated in part as follows:
It has been observed that Mary E. Seebach, in the opinion of the under-signed, has not met the standards of satisfactory performance and conduct as an Office Auditor of the Internal Revenue Service. Her relationship with her fellow employees, the public and her superiors has been something less than desirable.
11. By memorandum dated October 7, 1960, Mr. Celotti advised plaintiff that she would not be given a performance rating for the period ending September 30,1960, because cer *357 tain critical areas of her performance which would be specified in the near future were not considered satisfactory.
12. Although the plaintiff has requested as a finding that Mr. Celotti “developed an intense hatred toward her” and was prejudiced against her, Mr. Celotti testified at the trial and there was nothing in his testimony or demeanor, nor in the record of the case generally, which would support the finding requested by plaintiff. In placing plaintiff in a room with a carefully selected roommate, in restricting plaintiff’s contacts with the public, and in initiating plaintiff’s medical examination as related in finding 13, Mr. Celotti was exercising his best judgment and was not animated by personal bias.
13. In a memorandum dated August 26, 1960, from the chief of the Office Audit Section to the chief of the Employee Belations Section, it was stated:
It is requested that the conduct of Miss Mary E. See-bach towards the general public and her fellow employees be reviewed. This review is necessitated by the repetition of events which indicate that this employee’s actions are unstable and tend to discredit the Service.
After describing plaintiff’s errant conduct in detail, the letter concluded by recommending that plaintiff be subjected to psychiatric examination to determine her mental fitness for the position which she held.
14. Subsequent to receiving the memorandum of August 26, 1960, the Employee Belations Officer called Dr. Harding, the psychiatrist in charge of the U.S. Public Health Service Hospital in San Francisco, apprised him of the information he had received concerning plaintiff, and requested his opinion as to whether a fitness-for-duty examination was in order. Dr. Harding advised the Employee Belations Officer that such an examination was in order and arrangements were made for such an examination.
15. In a letter dated October 7,1960, the District Director advised plaintiff in part as follows:
On October 7,1960, you were notified of the postponement of your annual performance rating because of some questions concerning your work performance.
*358 I have now received detailed information from your supervisors concerning your unsatisfactory work performance. Tbis information also indicates that your performance may be seriously influenced by wh'at I consider a possible emotional condition. Of course, any decision concerning your emotional condition _ and to what extent this affects your work will necessarily have to be determined by a member of the medical profession. Therefore, before any disciplinary action is taken in regard to your unsatisfactory work performance and in order to' protect your rights to disability retirement, 1 have decided that the question of your behavior must first be resolved.
You are hereby directed to report to the TJ.S. Public Health Service Hospital, 15th & Lake Streets, San Francisco, for the purpose of having a complete medical examination.
16. On October 12, 1960, plaintiff was examined by Dr. Harding for about one hour, and, in a report which was sent to the Employee Delations Officer of IES, he diagnosed her condition as a “paranoid state” and stated that the prognosis was “not good at this time”.
17. Upon receipt of that report, the Employee Eelations Officer called Dr. Harding and asked him if there were any other information which he could give him concerning whether plaintiff should be considered for disability retirement and Dr. Harding stated that he wou(ld send an additional letter concerning this matter. Thereafter, in a letter dated October 13, 1960, to the Employee Eelations Officer, Dr. Harding stated in part as follows:
No doubt at one time Miss Seebach was a competent employee but at the present, she shows signs of decom-pensation exhibited by a Paranoid Eeaction. Because of this illness, I would suggest she be given a disability retirement.
18. Subsequent to the receipt of Dr. Harding’s letter, the Employee Eelations Officer again called Dr. Harding. Dr. Harding apprised him that he was correct in his belief that plaintiff was sick and he agreed with him that plaintiff should be placed on sick leave.
19. The Employee Eelations Officer then called Dr. Meredith, the Eegional Medical Officer of the Civil Service Com *359 mission. He was advised that Dr. Meredith was not in town and that if he wanted medical assistance he should call Captain Gilbert, a Navy doctor, who was acting for Dr. Meredith in his absence. The Employee Eelations Officer called Dr. Gilbert and read him the October 13th letter and the report from Dr. Harding concerning plaintiff and asked him whether it would be proper to place plaintiff on sick leave. Dr. Gilbert replied that it would be. Dr. Gilbert was also asked whether, considering Dr. Harding’s diagnosis of plaintiff, the agency should apply for plaintiff’s disability retirement, and he stated that they should.
20. The Federal Personnel Manual, which is the official medium of the United States Civil Service Commission for issuing its regulations, instructions and suggestions to other agencies, as it existed in the latter part of 1960, provided that:
A definite duty devolves upon the agency not to separate, an employee in ill health if he has the necessary service to qualify for disability retirement. The agency should, especially if the disabling condition is mental, file disability retirement application on behalf of the employee. Under the rule laid down in Anderson v. Morgan, 263 F. 2d 903, and 39 Comp. Gen. 89, it is error to separate the 5-year employee whose mental condition impairs his judgment and ability to make decisions and any such separation effected is subject to cancellation.
21. By letter dated October 18,1960, plaintiff was advised in part as follows by the District Director of IRS:
I am writing this letter in regards to the recent medical examination you had at the U.S. Public Health Service Hospital, San Francisco, on October 12, 1960. We have just received the written results of this examination and as a consequence the following actions are necessary:
Effective immediately you are being placed on sick leave. This decision has been brought about by your abnormal behavior evidenced on the job, and which resulted in the medical examination mentioned above. Your supervisors in the Audit Division have reported your conduct as being belligerent towards taxpayers, strongly prejudiced toward men and marriage, uncooperative, and overly critical of the service as your em *360 ployer. This conduct has tended to discredit you with the general public and your fellow employees. The written medical opinion expressed in your case indicates your emotional behavior as abnormal, therefore, I have decided that you should be placed on sick leave immediately.
Next, it follows that your mental condition has rendered you incapable of further useful service with the Revenue Service, and you are hereby advised of your right to file for disability retirement. Application Form 2801 is enclosed for such purpose, however, I must receive the completed application from you within 7 calendar days from the date you receive this letter, or I will conclude that you are not going to file for Disability Retirement. If you refuse to file the application for disability retirementj the Internal Revenue Service will then file the application in your behalf.
22. The decision to place plaintiff on sick leave was coordinated with the Regional Office of IRS, which is the next higher level above the District Office.
23. The letter of October 18, 1960, advising plaintiff that she was to be placed on sick leave was hand-delivered to plaintiff in the office of Mr. Wood, the chief of the Office Audit Branch. The agency was concerned that upon receipt of the letter plaintiff might become violent and threaten either her group supervisor, the chief of the Office Audit Branch, or the District Director, or else destroy the income tax returns in her possession. Therefore, in conjunction with the Intelligence Division of IRS, a plan was evolved whereby two special agents from the Intelligence Division were posted outside Mr. Wood’s office and two others were in the District Director’s office. While plaintiff was in Mr. Wood’s office prior to receiving the letter, her group supervisor removed all tax returns from her files. These precautions proved to be unnecessary. After receiving the letter, plaintiff was accompanied back to her office by her group supervisor where she gathered together her personal belongings. When she finally left the building an all-clear signal was flashed to the District Director’s office. As it developed, when plaintiff received the letter she did not become violent but she did launch into a tirade when Mr. Celotti, her group supervisor, accompanied her to her office *361 and she stated that the Catholics were responsible for the agency’s action.
24. By letter dated October 24, 1960, plaintiff advised the Civil Service Commission that she did not wish to apply for disability retirement.
25. In an application dated November 9, 1960, the IRS applied to the Civil Service Commission for plaintiff’s disability retirement.
26. If Dr. Harding had examined plaintiff and found that she was not suffering from a mental illness, the IRS would have separated her for cause in 1960 on the charges which ultimately formed the basis for her removal in 1962.
27. By letter dated January 10, 1961, the Civil Service Commission advised plaintiff that the IRS “has submitted to this Commission an application for your retirement on the basis that you have a nervous condition which prevents you from rendering useful and efficient service in the position you hold as Tax Examiner”. The letter continued:
From the evidence submitted in your case, the medical officers of the Commission feel that you are totally disabled for useful and efficient service in the position you now hold.' If you are not in agreement with this opinion and have been under the observation and treatment of any physician recently and if you care to do so, you may submit a statement from your physician describing in detail your present physical condition.
This letter is not meant to indicate that a final decision has been reached on your department’s claim. No formal action has been taken to date * * *.
28. In opposition to the agency’s application, plaintiff submitted statements from her personal physician, Dr. Sadie E. Berkove, a specialist in obstetrics and gynecology, and Dr. Felix Ocko, a psychiatrist. Dr. Berkove, who had been in private practice since 1935 and had been plaintiff’s personal physician for 18 years, had examined plaintiff on July 1, 1958, November 25, 1960, and on December 9 and 30, 1960. She testified that the plaintiff was emotionally stable and was not suffering from a mental condition on October 18, 1960, nor was physically and mentally incapable of doing her job with IRS at that time. Dr. Ocko, a private psychiatrist whose expert qualifications were conceded by the *362 defendant, and to whom plaintiff had been referred by Dr. Berkove, examined plaintiff on February 14, 1961 and March 24, 1961, and made a psychiatric evaluation of her. Dr. Ocko advised the Bureau of Retirement Insurance on March 24,1961 that plaintiff was fully oriented and coherent with no thought disorders, that in his opinion there had been no change in tire plaintiff’s mental or emotional condition in recent years, that he did not think she was suffering from a serious mental disorder at any time from October 18, 1960 through June 19,1961, and that she was mentally capable of performing her duties with IRS throughout that period. He testified that mental illness legally applies to someone who is ill enough to be committed by a court, and disagreed with Dr. Harding’s diagnosis of “paranoid condition”, attributing it to the latter’s inexperience. Dr. Ocko further testified that having a disputatious nature or expressing pronounced opinions might make a person difficult to work with but would not make that person mentally ill. On the occasions when the plaintiff was examined by Doctors Ber-kove and Ocko she was well-groomed and presented a different appearance than she presented in her office at the IRS.
29. By letter dated February 28, 1961, the Civil Service Commission advised plaintiff in part as follows:
On the basis of your recent examination it has been determined that you are totally disabled for useful and efficient service in your position and should be be retired on an annuity. If you wish your annuity to begin promptly, please write us immediately giving the address to which you wish your checks sent.
If you desire, you are privileged to appeal, within 30 days from receipt of this letter, from the decision to retire you.
30. Plaintiff appealed from the Commission’s determination and in support of her appeal submitted further correspondence from Dr. Berkove and Dr. Ocko. Dr. Ocko’s letter of June 14, 1961, to the Civil Service Commission expressed his opinion that the plaintiff “remains psychologically and psychiatricaJly qualified to perform her functions as an auditor * * Dr. Berkove, in a letter to the Civil Service Commission on March 30, 1961, stated that her *363 experience with the plaintiff as a patient for 14 years did not provide the “remotest suggestion of permanent physical disability or mental inadequacy. * * * there is nothing either physical or mental to prevent this patient from continuing with her present occupation and I think to suggest otherwise, is outrageous. * *
31. By letter dated April 13,1961, in response to plaintiff’s appeal, IRS stated in part as follows:
* * * [T]he appellant alleges that this Service, on initiating Miss Seebach’s application for disability retirement, did so for the primary purpose of avoiding compliance with Section 6(a) of the Act of August 24, 1912, as amended. * * *.
Further, in regard to their contentions, it is advised that prior to the time this Service initiated the application for Miss Seebach’s disability retirement, consideration was given to her removal from the Service for reasons of unsatisfactory conduct which were personal to the employee. These reasons involved an element of human behavior and concerned her personal relationships with supervisors, co-workers, trainees, and the tax-Eaying public. Because it is a recognized premise in the elds of psychology and psychiatry that there is a cause for all behavior, it was felt that possibly Miss Seebach’s problems may have been medical. Therefore, arrangements were made for Miss Seebach’s complete medical examination at the United States Public Health Service Hospital, the results of which you have in the record. Consequently, rather than avoiding a necessity of complying with Section 6(a) of the aforementioned Act, as the appellant contends, this Service was complying with the requirement that an agency protect the rights of the employee to a disability retirement annuity. These regulatory requirements are as follows:
The agency then quoted the excerpt of Chapter R-5-39 of the Federal Personnel Manual set out in finding 20.
32. As a result of plaintiff’s appeal, the Civil Service Commission had plaintiff examined on May 19,1961, by a neuro-psychiatrist at the Veterans Administration Hospital in Oakland, California. In his report of that examination, the neuropsychiatrist, Dr. Thomas, concluded:
* * * If symptoms of a paranoid type were found in September, it can only be said that in the intervening *364 six months they have subsided and there is no clinical evidence of notable personality disturbance, psychosis or psychoneurosis found at this time.
33. On June 16,1961, the Bureau of Retirement and Insurance of the Civil Service Commission advised IRS that the latter’s application to obtain the retirement of plaintiff was rejected “because it has been determined that the employee is not totally disabled within the meaning of the retirement law.”
34. On August 18, 1961, IRS filed an appeal with the Board of Appeals and Review of the Civil Service Commission to the action described in the preceding finding, consisting of a seven-page letter and over 50 pages of attachments. The letter supplied in considerable detail the IRS’s evaluation of plaintiff’s ability to perform her job, its concern for plaintiff’s welfare, and its attempt to comply with the requirements of the Federal Personnel Manual.
35. As a result of the IRS’s appeal, the Civil Service Commission decided to defer ruling on the appeal until further psychiatric examination of plaintiff was obtained and on September 5, 1961, instructed plaintiff to submit to such an examination.
36. Plaintiff received a neuropsychiatric examination at the U.S. Naval Hospital in Oakland, California, on October 21,1961, and the report of the examining doctor, Dr. Greene, was in part as follows: “The patient cannot be considered seriously ill emotionally. More specifically there is no evidence of any paranoid reaction. Impression: no psychiatric illness is present which would make the patient unemployable.”
37. By letter dated January 5, 1962, the Civil Service Commission advised the Regional Commissioner of the IRS and the plaintiff that the medical information did not support the conclusion that plaintiff was totally disabled for useful and efficient service as a tax examiner and that, therefore, its previous action in disallowing the agency’s application for her disability retirement was affirmed.
38. During the period that the Civil Service Commission was considering the IRS’s application for plaintiff’s disability retirement, IRS carried her on involuntary sick *365 leave, involuntary annual leave, and involuntary leave without pay. As previously stated, she was placed on sick leave on October 19, 1960. She remained thereon until December 7, 1960, when she was placed on annual leave at her request. Plaintiff requested that she be placed on annual leave so that she could use the annual leave that she had to use or forfeit before the end of the 1960 pay year. Plaintiff remained on annual leave until January 7, 1961, when she was again placed on involuntary sick leave, and she remained thereon until March 1, 1961, when her sick leave expired and she was placed on involuntary annual leave. She remained on annual leave until noon on June 19, 1961, when it expired and she was placed on involuntary leave without pay. She remained on leave without pay until February 19, 1962, when she returned to duty.
39. By letter dated July 19, 1962, plaintiff appealed the agency’s action in placing her on involuntary annual and sick leave during the period October 19, 1960, to June 19, 1961, to the Twelfth Regional Office of the Civil Service Commission and requested that the agency be required to reinstate that leave.
40. In a decision dated September 6, 1962, the Regional Office determined that plaintiff’s appeal was untimely and declined to accept it.
41. Plaintiff appealed the Regional Office’s decision to the Board of Appeals and Review of the Civil Service Commission and by letter dated February 25, 1963, the Board of Appeals and Review advised plaintiff that, since her placement on paid leave for the period in question was not an adverse action, there was “no basis for consideration or action with respect to the matter”. By way of explanation, that letter stated in part as follows:
* * * The Region made no determination whether the action complained of, Miss Seebach’s placement in a paid leave status in October 1960, was an adverse action ap-pealable to the Civil Service Commission within stated time limits. In effect, the Region’s decision was that even if Miss Seebach had been the subject of an adverse action in October 1960, no basis was found for entertaining an initial appeal from such action in July 1962.
* * * * *
*366 Although the Region’s decision did not contain such a determination, your appeal to this Board appears to assume that the agency’s action placing Miss Seebach in a paid leave status was an adverse action from which she could appeal to the Commission as a matter of right. Consequently, the Board has examined this aspect of the case in order to clarify the apparent misunderstanding.
According to the record, Miss Seebach was advised that she was being placed on sick leave, effective immediately, on the basis of a medical report indicating a disabling emotional illness. Thereafter she was carried on the rolls in a paid leave status, sick and annual leave, until June 19, 1961, at which time she was placed in a non-pay status in accordance with the procedures prescribed by the Civil Service Regulations.
i|: # # %
The Board is unable to agree with your view that Miss Seebach’s case is virtually identical to that of Hart. The record clearly shows that Miss Seebach was placed in a leave status because of medical evidence of incapability and not for disciplinary reasons. The record also shows that the action placing her on leave was related to the application for her retirement because of disability and not to any disciplinary action proposed or, at that time contemplated. The Board finds no basis for con-, eluding that, by analogy to the Hart case, Miss Seebach’s placement on paid leave represented a suspension or any other adverse action appealable to the Commission under the provision of the then current Part 9 of the Civil Service Regulations.
42. Prior to placing plaintiff on leave without pay, IRS advised her by letter of April 11, 1961, that there was a strong possibility that there would not be a final decision on its application for her disability retirement by the time her annual leave was exhausted and that if that happened, the IRS would then carry her in a leave without pay status pending final adjudication of the disability retirement application. They further advised her that unless she consented, Part 9, the adverse action provisions of the Commission’s regulations, would have to be followed and asked whether she would consent to being carried on leave without pay when her annual leave was exhausted. Plaintiff refused to give her consent.
43. By letter dated May 3, 1961, the Acting District Di *367 rector of INS charged, plaintiff with not being fit for duty and gave her notice that INS proposed to place her in a leave without pay status for an indefinite period after her sick and annual leave were exhausted pending final decision on the agency’s application for her disability retirement. In support of the proposed action, the Acting Director referred to Dr. Harding’s examination and diagnosis of plaintiff’s condition in October 1960. He also advised plaintiff that she had a right to reply to the charge 'both in person and in writing within ten days and to submit affidavits and other evidence in support of her answer.
44. By letter dated May 12, 1961, plaintiff replied to the notice proposing to place her in a leave without pay status and requested a hearing before the Grievance Committee of INS. Pursuant to her request, a hearing was held before an official of the INS on May 23, 1961, and the proceedings of said hearing were thereafter transcribed.
45. By letter dated June 2,1961, the District Director for the San Francisco District of the INS notified plaintiff that after a careful review, he had reached the conclusion that the charge that she was not fit for duty as outlined in the letter of proposed action was sustained, and, therefore, his final decision was that she would be placed on leave without pay when her sick and annual leave were exhausted. He advised plaintiff of her right to appeal his decision to the Negional Commissioner of INS or to the Civil Service Commission.
46. By letter dated June 21, 1961, plaintiff appealed the decision of the District Director to the Negional Office of the Civil Service Commission. By letter dated January 15,1961, the Negional Office determined that the agency’s action placing her on leave without pay was tantamount to a suspension and, therefore, was subject to the procedural requirements of Part 9 of the Commission’s regulations but advised plaintiff that her appeal was denied since those regulations were complied with. In setting forth the reasons for the denial the Negional Office’s letter stated in part as follows:
It was contended in the appeal that the reasons for the action were deficient with respect to specificity and detail. The reason for proposed suspension, as stated in the advance notice, was a diagnosis by Dr. Harding *368 of th© Public Health Service Hospital in San Francisco that Miss Seebach was suffering from a serious mental illness which caused Dr. Harding to recommend she be given disability retirement. It was indicated in the advance notice that the medical prognosis of Dr. Harding was a consideration in the agency’s opinion that Miss Seebach should not remain in the work status during the period pending the determination of her disability retirement case. At the agency’s hearing of May 23, 1961, Mr. Robert Doty, Employee Relations Officer, explained that since the medical findings were that a mental illness was involved, it was not considered advisable and appropriate to divulge the details of the diagnosis and prognosis to the employee or to a nonmedical representative. We see no error in this determination, and we find no regulatory defect with respect to the reasons given Miss Seebach for the action proposed.
After careful review of the record, we find that the Internal Revenue Service has complied with the procedural requirements of the Commission’s regulations in suspending Miss Seebach effective June 19, 1961, pending determination of an application for disability retirement filed in her behalf by the employing agency, and in the absence of appellate authority to give consideration to the sufficiency of the reasons for the suspension, no basis exist for giving favorable consideration to her appeal. * * *.
47. By letter dated January 18, 1962, plaintiff appealed the decision of the Regional Office to the Board of Appeals and Review of the Civil Service Commission. By letter dated June 21,1962, the Board of Appeals and Review concurred in the findings of the Regional Office and affirmed its holding that the agency’s action in placing plaintiff on leave without pay was effected in compliance with the procedural requirements of the Commission’s regulations. In that letter the Board of Appeals and Review stated in part: .
A review of the file shows that the medical evidence which was before the agency at the time action was proposed did reflect a very serious mental illness. The record also shows that at that time the evidence was sufficient to warrant a decision by the Civil Service Commission that Miss Seebach was totally disabled for useful and efficient service. Under these circumstances, a decision that disclosure of the detailed evidence would *369 not be in the best interest of Miss Seebach does not seem unreasonable.
48. The Board of Appeals and Review denied plaintiff’s motion for a reconsideration of its decision on November 30, 1962.
49. By letter dated February 15, 1962, the agency notified plaintiff who, at that time, was on involuntary leave without pay, that since the action filed in her behalf for disability retirement had been denied, she could return to work on Monday, February 19,1962.
50. On February 19,1962, when plaintiff returned to duty, she was immediately served with a letter of charges of that same date proposing her removal on charges of inefficiency and emotional instability. The emotional instability and inefficiency were described, and specific instances were cited.
51. Plaintiff replied to the letter of proposed removal in writing and, in addition, at her request, a transcribed oral hearing was held on March 22,1962. By letter dated May 8, 1962, which was given to plaintiff on that same date, the District Director advised plaintiff that after careful consideration of the charges of emotional instability and inefficiency and her replies, it had been decided that the charges were sustained and that plaintiff would be removed effective May 11,1962.
52. By letter dated May 15, 1962, the plaintiff appealed her removal to the Regional Office of the Civil Service Commission. By letter dated June 19, 1962, the Regional Office advised plaintiff’s attorneys that no basis existed for giving favorable consideration to her appeal inasmuch as it had been determined that the IRS had complied with the procedural requirements of the Commission’s regulations in effecting her removal.
53. Plaintiff appealed her removal to the Board of Appeals and Review of the Civil Service Commission, and by letter dated December 13, 1962, that Board affirmed the decision of the Regional Office.
54. On April 1, 1963, plaintiff filed a complaint in the Southern Division of the District Court for the Northern District of California wherein she alleged that she had been wrongfully discharged from her position in the IRS and *370 sought restoration to her position. In a decision dated November 1, 1963, Seebaoh v. Cullen, 224 F. Supp. 15 (1963), wherein it held that the defendant had complied with the applicable statutes and regulations in effecting plaintiff’s removal, the District Court granted the defendant’s motion for summary judgment and dismissed plaintiff’s complaint. On appeal, the Court of 'Appeals for the Ninth Circuit affirmed the judgment of the District Court. Seebach v. Cullen, 338 F.2d 663 (1964).
55. As of the date she testified at the trial of this case in May 1966 plaintiff had not been reemployed by the U.S. Government since her removal on May 11,1962.
56. Subsequent to the filing of plaintiff’s petition in this court each of the parties filed a motion for summary judgment which was denied by the court in an order dated January 7, 1966, which returned the case to the trial commissioner for a trial on the issue of “whether plaintiff was able to perform her official duties during the time she was placed on involuntary leave”.
57. At the trial of this case there was testimony for the plaintiff concerning her mental and emotional stability from herself, Doctors Berkove and Ocko (whose views are presented in finding 28, supra), and Mary Tabor, the plaintiff’s landlady. The latter testified that plaintiff had been a tenant in a unit of a small apartment house owned by her for 19 years, that plaintiff was a good tenant, dressed like anyone else, appeared to be normal in her conduct, and created no complaints from others. Mrs. Tabor was not a close friend of plaintiff, and had no knowledge of plaintiff’s conduct on her job. In addition to the above, since about 1950 plaintiff had served as a photographer’s mate in the United States Naval Beserve in an enlisted capacity, took two weeks active duty training each year, attended regular meetings, reenlisted in 1964, and in her annual physical examinations for such service was found at all times to be physically fit to perform her military duties. None of the medical examinations which plaintiff received while in the Naval Beserve included a psychiatric examination, but no such examination would normally be given without cause.
*371 CONCLUSION OK L/AW
Upon tbe foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover on her claim and judgment is entered to that effect, with the determination of the amount of recovery to be reserved for further proceedings under Kule 47 (c).

 This opinion incorporates, with additions and some modifications, tile opinion prepared, at the direction of the court, by Trial Commissioner C. Murray Bernhardt.

 All other aspects of plaintiff’s claim were rejected by the court’s order of January 7, 1966, which denied both parties’ motions for summary judgment and returned the case to the trial commissioner “for trial on the issue of whether plaintiff was able to perform her oficial duties during the time she was placed on involuntary leave.”

 “Any employee who completes five years of civilian service and who is found by the Commission to have become disabled shall, upon his own application or upon application T>y Ms department or agency, be retired on an annuity * * [Emphasis added.] Civil Service Retirement Act §7(a), 5 U.S.C. § 2257(a) (1964).

 Seebach v. Cullen, 224 F. Supp. 15 (N.D. Cal. 1963), aff’d, 338 F. 2d 663 (C.A. 9, 1964), cert. den., 380 U.S. 972 (1965).

 Lloyd-LaFollette Act, 37 Stat. 555 (19X2), as amended, 62 Stat. 354 (1948), 5 Ü.S.C. § 652 (1964) :
(a) “No person In the classified civil service of the united States shall be removed or suspended without pay therefrom except for such cause as will promote the efiiciency of such service and for reasons given in writing. * * *”
(b) “(1) Any person removed or suspended without pay under subsection (a) of this section who, after filing a written answer to the charges as provided under such subsection or after any further appeal to proper authority after receipt of an adverse decision on the answer, is reinstated or restored; to duty on the ground that such removal or suspension was unjustified or unwarranted, shall be paid compensation at the rate received on the date of such removal or suspension, for the period for which he received no compensation * * * less any amounts earned by him through other employment during such period, and shall for all purposes except the accumulation of leave be deemed to have rendered service during such period. * * *” (Emphasis added.]

 Tie Government says that “Neither the Civil Service Commission’s regulations nor its instructions to the agencies in the Federal Personnel Manual prohibit an employee’s separation while an application for his disability retirement is pending.”

 5 C.E.R. § 30.803 (I960).

 In this context we are not using the term “suspension” in its technical civil-service sense but simply as a synonym for placing the employee on involuntary or enforced leave.

 In United States v. Abbett, 381 F.2d 609, 611, 612 and n.6 (C.A. 5, 1967), the Civil Service Commission explicitly found on appeal that the employee was not disabled “based on the latest examination”; the court held that “it was not the intent of the Act to permit recovery by an employee simply because later evidence, contrary to that upon which the decision was based, is presented to and accepted by the appellate board” and also that there was no determination “made or implied” that that employee was not disabled at the time she was placed upon involuntary sick leave,

 5 C.K.R. I 30,702, 27 Fed. Reg. 221, January 9, 1962.