**Dante S. REALE**

**v.**

**The UNITED STATES.**

**No. 334-65.**

United States Court of Claims.

July 16, 1969.

---

Alan A. Green, New Britain, Conn., attorney of record, for plaintiff.

LeRoy Southmayd, Jr., Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

### OPINION

DAVIS, Judge.

This is an action brought to test the legality of plaintiff's release in July 1961 from active duty in the Air Force. At that time he was a reserve officer serving on extended active duty, holding the rank of captain. He had a generally

good record, both parties agree, during his three years of World War II service and his ten years following his voluntary recall from the Reserves in 1951. The disputed service began after his assignment to the Fifth Air Force in Japan which led ultimately to his release from active duty.

Captain Reale, trained as an air observer (bombardier) and as an intelligence officer, was assigned to the 6000th Support Wing as a "surplus" intelligence officer in December 1959. In April 1960, he was given the job of Club Officer at first one and then another Officer's Open Mess at or near Fuchu Air Station, Japan. His performance in this slot resulted in a very derogatory officer's effectiveness report (usually abbreviated as OER) written on July 19, 1960, by his superior. Plaintiff filed a lengthy rebuttal to this report, purporting to refute each specific charge and generally laying the blame for his difficulties at the feet of his commanding officer, the author of the uncomplimentary survey. After an investigation, the OER was indorsed, as written, by the Deputy Commander for Administration and finally by the Wing Commander (on September 7, 1960), thereby becoming a part of Reale's permanent file. An appeal to the Officer Personnel Records Review Board to have the report removed was denied on December 20, 1960.

In the meantime the derogatory OER was the cause of two significant adverse actions against plaintiff. By letter of September 12, 1960, he was informed that "you have been placed on the Control Roster" pursuant to Air Force Regulation (AFR) 36–40,[1] under the provisions of which "Your reporting official has placed you under special observa- for 120 days upon completion of which a special effectiveness report will be rendered". He was specifically warned that—

2. It is expected that you will avail yourself of this opportunity to demonstrate that your performance can be raised to the standard expected of an Air Force officer. Continued substandard performance will make you subject to consideration for action that could result in release from active duty or elimination.

3. You will be advised of the results of this period of observation.[2]

By this time, Captain Reale had been assigned to the 6000th Supply Squadron, under a new reporting officer. His performance during the trial period at the new post was satisfactory, and on January 24, 1961, this reporting officer submitted a Special Officer's Effectiveness Report which was complimentary. The new report was reviewed and indorsed by the same Deputy Commander and Wing Commander (the latter on February 6th), and on February 13th Fifth Air Force Headquarters advised that plaintiff had been removed from the Control Roster. But this happy ending gave plaintiff little cause for rejoicing, for two weeks earlier he had learned that he was nevertheless to be released from active duty, regardless of the outcome of the 120-day trial-period.

Unknown to Reale, sometime in October 1960—after the warning letter of September 12th *supra*—the Commander of the Pacific Air Forces had recommended him for release from active duty or demotion under AFR 36–35.[3] The specific reason for this action does not appear; however, there is nowhere suggested any additional cause other than the derogatory effectiveness report which led to the special 120-day observation period under AFR 36–40.[4] Also

---

1. Dated July 17, 1958; amended by AFR 36–40A of May 25, 1960. For convenience, the regulation as amended will be referred to as AFR 36–40.

2. Finding 37 has the full text of this letter.

3. Dated April 8, 1960.

4. It is not entirely clear from the record just what procedures led to the action under AFR 36–35, especially whether the decision was initiated by plaintiff's Wing Commander, by the Fifth Air Force, or

without plaintiff's knowledge or notice to him, a board of officers had convened on December 1, 1960, at Headquarters USAF, to consider recommendations under AFR 36–35 regarding officers possessing the permanent reserve grade of captain, and had selected plaintiff for release from active duty as of July 31, 1961. This December board did not, of course, have before it the post-trial-period favorable OER later issued on January 24, 1961.

Captain Reale's first notice of this adverse board action was a letter two months later (January 31, 1961), sent through his Wing Commander, notifying him of the board's determination. A month later, on March 8th (well after the notification that he had been removed from the Control Roster because of the satisfactory report in January 1961) he was informed that his release had previously been approved by the Secretary of the Air Force on January 3rd (again, two months before the notice). Plaintiff sought redress under Article 138 of the Uniform Code of Military Justice from the Inspector General of the Fifth Air Force; the appeal was rejected on September 8, 1961. He was released from active duty, as earlier advised, on July 31, 1961. Subsequently he has twice applied, unsuccessfully, to the Air Force Board for the Correction of Military Records for removal of the derogatory OER and revocation of the orders releasing him from active duty.[5]

■ Plaintiff urges that AFR 36–35 must be read together with AFR 36–40, that so combined they do not allow for the institution of the AFR 36–35 proceedings before the end of the AFR 36–40 special observation period, and therefore that his release from active duty was in violation of the applicable regulations.[6] We agree. In measuring the personnel actions of both the military and civilian branches against the commands of their regulations we often find it necessary to look to more than one provision or one regulation. *See, e. g.,* Piccone v. United States, 186 Ct.Cl. 752, 407 F.2d 866 (1969); Faircloth v. United States, 186 Ct.Cl. 133 (1968); Biddle v. United States, *supra* note 5, 186 Ct.Cl. at 105–107 (concurring opinion); Glidden v. United States, 185 Ct.Cl. 515 (1968); Keef v. United States, 185 Ct.Cl. 454 (1968) (refusing to limit one regulation by the existence of another); Seebach v. United States, 182 Ct.Cl. 342 (1968); Middleton v. United States, 170 Ct.Cl. 36, 40 n. 6 (1965); Rowe v. United States, *supra* note 6, 167 Ct.Cl. at 468 (rationalizing AFR 39–17 and AFR 35–4). Indeed, it is usually essential that our interpretation take into account the interrelationship and interaction of the various available procedures—looking toward a unified and rational personnel

independently by the Commander of the Pacific Air Forces or his staff.

5. The adverse Correction Board determinations are irrelevant to our decision for, as will appear, plaintiff's release from active duty was in violation of the Air Force's own regulations. It should never have been necessary for him to go to the Correction Board for relief at all, and that Board could not cure the legally defective release. *See* Friedman v. United States, 158 F.Supp. 364, 373–374, 141 Ct.Cl. 239, 252–254 (1958); Morris v. United States, 163 Ct.Cl. 259, 260 (1963); Wason v. United States, 179 Ct. Cl. 623, 631 (1967); Biddle v. United States, 186 Ct.Cl. 87, 107 (1968) (concurring opinion).

6. It is undisputed that the Air Force was required to follow its own regulations in

releasing plaintiff. Roberts v. Vance, 119 U.S.App.D.C. 367, 343 F.2d 236 (1964). It is also plain that, if the release was defective because in violation of regulations, plaintiff is entitled to recover back pay. *See, e. g.,* Murray v. United States, 154 Ct.Cl. 185 (1961) (AFR 39–10); Smith v. United States, 155 Ct.Cl. 682 (1961) (Navy Bureau of Personnel Manual); Sofranoff v. United States, 165 Ct. Cl. 470 (1964) (Marine Corps Manual); Rowe v. United States, 167 Ct.Cl. 468 (1964) cert. denied, 380 U.S. 961, 85 S. Ct. 1103, 14 L.Ed.2d 152 (1965) (discharge upheld under AFR 39–17); Cole v. United States, 171 Ct.Cl. 178 (1965) (AFR 36–2); Hankins v. United States, 183 Ct.Cl. 32 (1968) (AFR 36–12).

management system and not a fragmented hodge-podge of unique, isolated, and contradictory rules. *See, e. g.,* Piccone v. United States, *supra*; Seebach v. United States, *supra*, 182 Ct.Cl. at 350–352. In *Piccone*, we recently held that, in the light of the peculiar burdens placed on a civilian Navy employee in prosecuting a disability retirement claim while at the same time defending an agency disability-discharge action, the Navy's Civilian Personnel Instructions should be construed to bar the institution of the discharge action until the disability retirement proceeding was finally resolved by the Civil Service Commission. A similar result is required in this case.

In September 1960, Captain Reale was notified of the beginning of a special trial-period on the Control Roster under AFR 36–40; he was in effect told that his performance had been unsatisfactory and that he was to be given a chance to prove himself anew, with grave sanctions possible if he did not show improvement, including "release from active duty or elimination". He entered upon this course, applying himself diligently to prove his worth to the Air Force during the 120 days he was given; he succeeded in lifting his performance measurably and obtained the approbation of his superiors. But without any notice to him, the Air Force, at the same time, started the secret AFR 36–35 procedure and released him outright, for precisely the same reason for which he had originally been put on the Control Roster.

The service's actions border on gross misrepresentation to Captain Reale, for the letter putting him on the Roster certainly implied that the sanction of release from active duty would not be imposed during the trial period. The institution of another, secret proceeding looking to that very end was contrary to the honest expectation of any man in Reale's position. One actively entering into a proffered trial period hardly anticipates that meanwhile he can be fired without regard to the results of the trial, at least for the same cause for which he was being put to the test; that is especially true when the warning letter tells him explicitly that he "will be advised of the results of this period of observation" and that "continued substandard performance will make you subject to consideration for action that could result in release from active duty * * *". Captain Reale could properly feel aggrieved at being unceremoniously yanked from active duty for substandard performance without any regard being paid to his service during the specified four-months proving period. We will not lightly assume that the Air Force intended such an unfair result to flow from its regulations.

While the comparative scope and relationship of the two regulations is not completely clear, the gist of AFR 36–40 and AFR 36–35 point to their consecutive and not contemporaneous use. AFR 36–40, entitled "Officers Control Procedure", specified that appropriate commanders will establish "Control Rosters", on which officers "whose performance is substandard or marginal" will be maintained. While on the Control Roster an officer may not be reassigned to another command. Paragraph 2 delineates the instances in which an officer's name will be put on the Control Roster, including failure to be selected for promotion to certain grades, receipt of a derogatory officer's effectiveness report, failure at a school attended at government expense, or when "his conduct or current performance of duty warrants such action". Commanders are to review records of their officers periodically, and, if due cause appears, to place him on the Roster "and/or" institute other "punitive or administrative action". When an officer is put on the Roster, he can be informed of a special 120-day observation period, after which a special OER will be issued. There is provision for a second 120-day period, and for commencement of other action on the basis of either the first or second special report. In addition, there are several instances in which commanders are authorized to place officers on the

Control Roster for identification only, not subject to special observation.[7]

AFR 36–35 concerns "Release From Active Duty and Demotion of Officers", and supplies a means for either removing or demoting an officer "who does not clearly demonstrate an ability and a willingness to accept and discharge the responsibilities and duties associated with his grade and rank." Regular Air Force officers are demoted under AFR 36–35; reserve officers serving in a grade equal to or lower than their permanent reserve grade (this was Captain Reale's position) cannot be demoted and must therefore be released from active duty. The reasons warranting action under AFR 36–35 are stated very generally, but relate primarily to inefficiency or incompetence.[8] Major air commanders or the Deputy Chief of Staff, Personnel, actually initiate the action, but recommendations may be forwarded by any commander. The Chief of Staff periodically appoints boards of officers to consider recommendations, and officers "nominated" before these boards convene are carried on the command Control Roster. The regulation does not specifically provide for any notice to the officer "nominated", but does require that a copy of his latest OER be forwarded to the board, which can recommend demotion, release, or retention on active duty at current rank. This recommendation then goes to the Secretary of the Air Force, whose decision is final.

There is also a third regulation which is pertinent—AFR 36–2, "Elimination or Release from Active Duty By Reason of Unfitness, Unacceptable Conduct, or Inefficiency".[9] We do not reach plaintiff's contention that his release could only have been under AFR 36–2, but we do find that regulation relevant to the correct interpretation of AFR 36–40 and AFR 36–35. AFR 36–2 provides for action against nonprobationary reserve officers on active duty (Reale's situation), either releasing them from such duty or eliminating them from the Air Force altogether (including the reserve position).[10] If the primary ground for action is inefficiency, AFR 36–2 instructs that AFR 36–35 be used; fifteen other grounds for action under its provisions are specified (¶5a) (under many of which Reale's reported conduct would fit). For the lesser ten of these reasons, a recommendation for release from active duty is appropriate, provided the officer has *not* had "extensive service" (¶5b, c) (completed or approaching ten years' active duty, ¶4b). Otherwise, apparently, elimination must be recommended and action taken on that basis (although release from active duty may become the ultimate sanction, ¶23a, b). An officer recommended for elimination from the Air Force under AFR 36–2 is entitled to notice of the charges against him, a hearing before a specially-convened Board of Inquiry, the right to counsel, and an opportunity to present and cross-examine witnesses. (¶¶12–18) Officers recommended only for release from active duty are given a copy of the recommendation by the recommending officer and accorded the opportunity to

---

7. The pertinent text of AFR 36–40 is set forth in finding 51.

8. See finding 49 for the specific provisions. It is significant that none of the four categories relate to a general reduction-in-force. This lack of authority under AFR 36–35, together with statements by the Air Force justifying plaintiff's release on the basis of his individual failings rather than an across-the-board reduction in personnel (see findings 43 and 46), conclusively rebut the defendant's contention that Reale's release was part of a general "R.I.F." (of which, according to defendant, he could not complain).

9. Dated November 8, 1957; amended by AFR 36–2A issued June 27, 1960. The amended regulation will be referred to as AFR 36–2.

10. Defendant argues that plaintiff has little reason to complain of a release from active duty, since he was not "discharged" completely from the Air Force, but retained his reserve status. The Air Force regulations clearly consider release a serious action; in practical terms it often means the end of an officer's active career and can affect his retirement and emoluments.

present in writing, as an indorsement to the recommendation, any material considered important to a decision. (¶¶11a(2), 12) In addition, a Board of Inquiry may be granted at the discretion of Air Force Headquarters. (¶4b)

As already noted, there is no specific provision for notice and answer under AFR 36–35,[11] and no such rights were granted Reale. If notice and opportunity to answer are not available under AFR 36–35—and if that directive applies while the officer is going through his 120-day observation period under AFR 36–40—then the regulations, taken all together, anomalously provide that an officers with less than ten years' service may be released from active duty pursuant to AFR 36–2, under which he has at least the right to notice and reply, but an officer with longer service can get similar rights only if he is recommended for total elimination from the service under AFR 36–2; he can be recommended for release from active duty only under AFR 36–35 which gives him no opportunity to present his case to the board of officers.[12]

This curious confusion of regulations, and especially the absence under AFR 36–35 of any express right to notice and answer, cause us to scrutinize even more closely, and to try to harmonize, the relationship of AFR 36–35 to AFR 36–40, since the special observation period and effectiveness reports under AFR 36–40 provide some notice of unsatisfactory performance and impending additional adverse action. Thus, basic considerations of fairness and the elementary rights of notice and opportunity to answer charges endangering a man's career both push toward a requirement that, once a special observation period has been initiated under AFR 36–40, other adverse action arising from the

same charge should await the outcome of that trial period.

The provisions of AFR 36–35 and AFR 36–40, although not absolutely free from doubt, point to the same result. First, AFR 36–40 seems throughout to contemplate the commander's opting either for observation periods *or* for more drastic action. Paragraph 3a requires that the records of all assigned officers be "reviewed periodically to determine whether any officer's performance or conduct warrants elimination, demotion, *or* special observation" (emphasis added). Paragraph 4c(2) provides that, if the report of the first observation period "indicates that the officer's performance is still substandard but does not warrant demotion or elimination", the officer may be placed under a second period of observation. And, finally, paragraph 4d states:

> *When* the first or second report indicates that the officer should be demoted, released from active duty in lieu of demotion (Reserve officers only), or eliminated, the commander *will* initiate action under *appropriate regulations*. Officers identified for demotion or release from active duty consideration will be retained on the Control Roster without requirement for additional observation, until final action has been accomplished under the provisions of AFR 36–35 (emphasis added).

This final section shows that the "proper time" for action under AFR 36–35 is after the completion of the latest observation period, that the "appropriate regulation" for release can be 36–35, that such action comes *after* the first or second report based on the 120-day period, and that, once such action has been initiated, the officer "will be retained on the Control Roster *without*

---

11. Plaintiff would imply such rights from the requirement in paragraph 6a that officers identified for consideration be carried on the command Control Roster.

12. Plaintiff's right to seek review, before the Officer Personnel Records Review Board, of derogatory information in his

record was an ineffective remedy—the Review Board's action (on December 20) was *after* the AFR 36–35 board had recommended him for release from active duty. Nor would such an appeal provide an opportunity to present arguments concerning a specific contemplated adverse action.

*requirement for additional observation"* (emphasis added).

The only provision of AFR 36–40 which leaves room for a contrary interpretation is paragraph 4a(1) authorizing a commander, upon discovering any of the reasons for Control Roster action, to "Initiate punitive or administrative action, *and/or"* place his name on the Control Roster and start the special observation period (emphasis added). The "and/or" could possibly be interpreted to authorize both the 120-day observation period and the summary, secret AFR 36–35 action simultaneously. However, we find it at least equally permissible, and more just, to read the provision as allowing the simultaneous taking of proper administrative steps (*i. e.,* other than a proceeding under AFR 36–35), which could include many administrative actions aside from release, demotion or elimination proceedings; [13] it could also authorize institution of AFR 36–35 proceedings while placing the officer on the Control Roster for identification purposes only, as indicated in paragraph 4d *supra.*

This same understanding of the proper order of procedure under AFR 36–40 and AFR 36–35 appears in the latter regulation. Paragraph 6a states:

Major air commanders submit the names of officers * * * to Headquarters USAF. Dates for submitting names are announced approximately 90 days before the boards convene. When officers are identified for consideration under this regula-

tion before the announced dates for nominations, their names will be carried on the command Control Roster (see AFR 36–40) and recommendations forwarded at the proper time. Defendant would read "proper time" to refer to "dates for submitting names" in the same paragraph. We find it more reasonable to consider it as referring back, in appropriate cases, to the relevant procedures under AFR 36–40, mentioned but five words before. "Proper time" in that sense would be after a first or second special OER had shown that the officer should be recommended for demotion or release from active duty. Additional support for this view is found in subparagraph 6a(2) which requires a copy of the latest OER to be contained in the recommendation for AFR 36–35 action; if the latest OER is more than ten months old, a new one is to be made. It would indeed be inconsistent for the Air Force to insist on the most up-to-date information on the officer's performance and to overlook entirely the results of a special observation study currently underway with regard to his usefulness to the service.[14]

▆ For these reasons we hold that AFR 36–40 and AFR 36–35, read together, require the Air Force to await the outcome of the special 120-day observation period and the special OER under 36–40 before instituting 36–35 action on the basis of the same initial derogatory effectiveness report.[15] Plaintiff's transfer to the Control Roster was for the express purpose of an observa-

13. *E. g.,* assignment within the command to other duties, restriction of activities, special training programs, stronger supervision, etc.

14. This is, of course, precisely what happened in plaintiff's case. The AFR 36–35 board acted without any information on the 120-day trial period.

15. This is certainly not a case where different conduct is the basis for two contemporaneous yet unrelated personnel actions or where, with clear sanction in regulations, two separate procedures are instituted against an employee, with full

notice to him of the institution and causes for both. Nor would it help the Air Force here if it could show that the two actions were instituted by different commanders (the record does not show the origins of the AFR 36–35 "nomination"). The service's left hand is bound to know what its right hand is doing in this area (*cf.* J. A. Jones Constr. Co. v. United States, 390 F.2d 886, 182 Ct.Cl. 615 (1968); L. W. Foster Sportswear Co. v. United States, 405 F.2d 1285, 186 Ct.Cl. 499 (Jan. 1969)), and the regulation would be as surely violated by two separate officers' actions as by that of a single commander.

tion period, not merely for identification preliminary to institution of the AFR 36–35 proceedings. The regulations were therefore violated and his release from active duty was void.

He is entitled to recover back pay, less appropriate offsets, and judgment is entered to that effect. The specific amount of his entitlement will be determined pursuant to Rule 47(c)[16]

---

16. Plaintiff's request for reinstatement (in addition to back pay) must, of course, be denied since we lack the power to give that remedy.